J-A12009-19

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| ROSEMARY RODERICK, | | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | Appellant | |
| | v. | |
| DANIEL L. RODERICK, | | |
| | Appellee | No. 594 WDA 2018 |

Appeal from the Order Entered March 22, 2018
In the Court of Common Pleas of Butler County
Civil Division at No(s): F.C. 15-90847-D

| ROSEMARY RODERICK, | | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | Appellee | |
| | v. | |
| DANIEL L. RODERICK, | | |
| | Appellant | No. 654 WDA 2018 |

Appeal from the Order Entered March 22, 2018
In the Court of Common Pleas of Butler County
Civil Division at No(s): F.C. 15-90847-D

| ROSEMARY RODERICK, | | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | Appellant | |
| | v. | |
| DANIEL L. RODERICK, | | |

<table>
<tr><td>Appellee</td><td>No. 1358 WDA 2018</td></tr>
</table>

Appeal from the Order Entered August 21, 2018
In the Court of Common Pleas of Butler County
Domestic Relations at No(s):  F.C. 15-90847-D

| ROSEMARY RODERICK, | IN THE SUPERIOR COURT |
| | OF |
| | PENNSYLVANIA |
| Appellee | |
| v. | |
| DANIEL L. RODERICK, | |
| Appellant | No. 1425 WDA 2018 |

Appeal from the Order Entered August 21, 2018
In the Court of Common Pleas of Butler County
Domestic Relations at No(s):  F.C. 15-90847-D

BEFORE:  BENDER, P.J.E., DUBOW, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY BENDER, P.J.E.:                FILED: JULY 11, 2019

Rosemary Roderick (Wife) appeals and Daniel L. Roderick (Husband) cross-appeals from the trial court's order, dated and entered on March 22, 2018, dismissing both Wife's and Husband's exceptions to the Master's Report and Recommendation, which dealt with equitable distribution and support issues.[1]  Wife also appealed and Husband cross-appealed from the order, dated and entered on August 21, 2018, that provided for a method of deferred

_____

[1] The following day, on March 23, 2018, the trial court entered the divorce decree.

- 2 -

monthly equitable payments to Wife, which were secured by a trust that was funded by an insurance policy. After review, we affirm.

Husband and Wife were married on June 2, 1979, and pursuant to the trial court's determination were considered separated on August 15, 2015, i.e., date of separation (DOS). The parties have two children, who are both emancipated. During the marriage, Husband was the breadwinner, and Wife managed the household, the child rearing duties, and the numerous relocations resulting from Husband's career moves. In relation to Husband's career and its effect on the parties' economic situation, the Master found:

> 61. The Master finds that through 1998 [Husband's] Earnings Record supports that the parties went from living a meager life style from date of marriage, to living a middle class life style from 1983 through 1990 to an upper middle class life style in the years through 1998;
>
> 62. The Master finds that from January, 1999 through December[,] 2008 the parties lived a conservative upper class life style in the form of having a high[-]end home, quality clothing and nicer vehicles, but that they certainly did not live a lavish life style with jet[-]setting across the globe with no worries of how the bills were to be paid, owning multiple homes where one was worth [$]1 million or more with others worth upwards of $700,000.00;
>
> . . .
>
> 64. The Master finds that it was the later years of 2009 through separation, or about 7.5 years, where the parties had the economic ability to be more carefree with their life style[.]

Master's Report and Recommendation (MR&R), 8/16/17, at Nos. 61, 62, 64.

Additionally, we note that around the time these proceedings began, Husband was the president and CEO of Westinghouse Electric Company

- 3 -

(WEC), a position that followed his employment with General Electric Corporation. The Master further found that Husband's annual earnings between 2006 and 2011 were over $500,000.00, but that his earnings skyrocketed during the subsequent years when he worked for WEC. Notably, Husband "was released from his first President/CEO position [at WEC] due to a corporate bankruptcy filed inside of 4.5 years after he assumed the helm of that corporation[.]" Id. at No. 52. However, prior to the bankruptcy, as described below, Husband accepted continued employment with Toshiba, WEC's parent company.

On December 29, 2015, Wife filed a divorce complaint that included claims for equitable distribution, alimony pendente lite (APL), alimony, counsel fees, costs and expenses. The court appointed the Master and following extended hearings held between June 1, 2017 and June 9, 2017, the Master issued her Report and Recommendation. Wife and Husband each filed exceptions, which were addressed by the court in its March 22, 2018 order and accompanying opinion now on appeal. Essentially, the court's order affirmed the Master's determination that a 50/50 split of marital assets was appropriate.

The court also affirmed the Master's determination that Husband had dissipated a marital asset by relinquishing his interest in WEC's executive pension plan (EPP), during contract renegotiation in 2016 with WEC, which occurred between the parties' separation in 2015, and the trial in this matter.

- 4 -

As part of the renegotiation with WEC and Toshiba, Husband received a $7,000,000 Nationwide insurance policy, which was paid into an irrevocable trust for his benefit. At the same time, without consulting Wife, Husband relinquished the parties' interest in the EPP and its promise of future payment to him of $37,064 per month, in the event that Husband would leave WEC, regardless of his age or years of service. The negotiations also produced other benefits to Husband, such as an increase in salary and bonuses, increased severance benefits, health insurance and reimbursement for travel related to his and his significant other's move to Japan, as he began his term of employment with Toshiba, and his possible subsequent return to work for WEC. However, most of these benefits did not materialize in that WEC filed Chapter 11 bankruptcy at the end of March 2017, but Husband did retain the $7,000,000 payment for the insurance policy that WEC had placed in an irrevocable trust to benefit Husband.

Notably, the trial court determined that the EPP was marital property and, therefore, affirmed the Master's decision that Husband was required to pay to Wife 310 monthly payments of $11,493 due to what was termed a dissipation of marital funds. The payments awarded to Wife were required to be secured by the trust through the existing Nationwide insurance policy or a substitute life insurance policy sufficient to cover any outstanding payments to Wife. These payments were the subject of the August 21, 2018 order that is now on appeal.

Additionally, a guideline APL award was determined, but the court found that a $95,953.07 deviation against the APL owed by Husband was appropriate in that during the period following the DOS, the parties continued to live in the marital residence and shared joint accounts. Also, based on findings by the Master that Husband had received income for his housing, a car and driver, and a relocation allowance for his move to Japan for the period between July 1, 2016 through December 31, 2016, the court found a deviation totaling $29,808.00 from the 2016 guideline APL amount that was due Husband.

As stated previously, Wife appealed and Husband cross-appealed from both the March 22, 2018 order and the August 21, 2018 order. This Court consolidated these cases by order issued on October 30, 2018. Wife now raises three issues for our review:

I.  Whether the court below erred or abused its discretion by failing to determine pursuant to 23 Pa.C.S. [§] 3501(a)(4) that an irrevocable $7,000,000 payment for a Nationwide insurance policy acquired by Husband when he renegotiated his employment contract post-separation but before divorce, resulted from an exchange of marital assets including, inter alia, the release of an employment benefit valued at $7,000,000 at the time of its release?

II. Whether the court below erred or abused its discretion when, after determining that Husband dissipated a marital employment benefit and ordering him to make compensatory equitable distribution payments to Wife totaling $3,562,830 over a 25 year period, the court failed to adequately secure the stream of payments against multiple risks which could lead to non-payment?

III.    Whether the court below erred or abused its discretion and disregarded established precedent when it ordered downward deviations against Husband's 2016 guideline APL obligation, based (1) on voluntary income sharing by the parties during 2015, before any legal proceedings were instituted, and (2) on the court's perception of the unfairness of the mandatory inclusion in net income, per the guidelines, of certain employment benefits received by Husband while working in Japan?

Wife's brief at 12-13.  Relating to his appeals, Husband raises two issues for

our review:

I.    The [t]rial [c]ourt committed an error of law by accepting [Wife's] determination of a monthly net benefit [Husband] would receive if the [WEC] [EPP] benefit were payable, when Husband has no entitlement to a WEC EPP benefit other than that guaranteed for 60 months by his 2013 [e]mployment [a]greement with [WEC].

II.    The [t]rial [c]ourt committed an error of law by accepting Wife's position, which did not limit the benefit to 60 months pursuant to Husband's 2013 [e]mployment [a]greement with WEC, where Husband did not meet the age and service requirements to receive a benefit under the WEC EPP before his employment ended with WEC.

Husband's brief at 5.

The following principles guide our review:

> Our standard of review in assessing the propriety of a marital property distribution is whether the trial court abused its discretion by a misapplication of the law or failure to follow proper legal procedure. An abuse of discretion is not found lightly, but only upon a showing of clear and convincing evidence.

> Smith v. Smith, 904 A.2d 15, 18 (Pa. Super. 2006) (quoting McCoy v. McCoy, 888 A.2d 906, 908 (Pa. Super. 2005)).  As we previously observed, in the context of an equitable distribution of marital property, a trial court has the authority to divide the award as the equities presented in the particular case may require.

Mercatell [v. Mercatell], 854 A.2d [609,] 611 [(Pa. Super. 2004)]. "In determining the propriety of an equitable distribution award, courts must consider the distribution scheme as a whole. We measure the circumstances of the case against the objective of effectuating economic justice between the parties and achieving a just determination of their property rights."[3] Morgante v. Morgante, 119 A.3d 382, 387 (Pa. Super. 2015) (quoting Biese v. Biese, 979 A.2d 892, 895 (Pa. Super. 2009)). "[A] master's report and recommendation, although only advisory, is to be given the fullest consideration, particularly on the question of credibility of witnesses, because the master has the opportunity to observe and assess the behavior and demeanor of the parties." Moran v. Moran, 839 A.2d 1091, 1095 (Pa. Super. 2003).

[3] The relevant factors in an equitable distribution determination are:

(1) The length of the marriage.

(2) Any prior marriage of either party.

(3) The age, health, station, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties.

(4) The contribution by one party to the education, training or increased earning power of the other party.

(5) The opportunity of each party for future acquisitions of capital assets and income.

(6) The sources of income of both parties, including, but not limited to, medical, retirement, insurance or other benefits.

(7) The contribution or dissipation of each party in the acquisition, preservation, depreciation or appreciation of the marital property, including the contribution of a party as homemaker.

(8) The value of the property set apart to each party.

(9) The standard of living of the parties established during the marriage.

(10) The economic circumstances of each party at the time the division of property is to become effective.

(10.1) The Federal, State and local tax ramifications associated with each asset to be divided, distributed or assigned, which ramifications need not be immediate and certain.

(10.2) The expense of sale, transfer or liquidation associated with a particular asset, which expense need not be immediate and certain.

(11) Whether the party will be serving as the custodian of any dependent minor children.

23 Pa.C.S. § 3502(a).

Cook v. Cook, 186 A.3d 1015, 1025-26 (Pa. Super. 2018).

Wife begins her discussion relating to her first issue, which challenges the identity by the court of the Nationwide insurance policy as non-marital property. Wife contends that the policy was exchanged for the EPP, which the trial court found to be marital property. Initially, Wife cites the definition section of the statute that states in pertinent part:

(a) General rule.—As used in this chapter, "marital property" means all property acquired by either party during the marriage.... However, marital property does not include:

. . .

(4) Property acquired after final separation until the date of divorce, except for property acquired in exchange for marital property.

23 Pa.C.S. § 3501(a)(4) (emphasis added). Wife also cites the following introductory language from 23 Pa.C.S. § 3502(a), which contains the list of factors appearing above in the quote from the Cook opinion:

> (a) General rule.—Upon the request of either party in an action for divorce or annulment, the court shall equitably divide, distribute or assign, in kind or otherwise, the marital property between the parties without regard to marital misconduct in such percentages and in such manner as the court deems just after considering all relevant factors.

Wife then explains that Husband had signed an employment agreement when he began his employment with WEC on September 25, 2012. That initial agreement was amended in November 2013, and was in effect on the DOS, August 15, 2015. Following Wife's filing for divorce in December of 2015, Husband and WEC renegotiated the 2013 agreement in June of 2016 at the time Husband was taking on the added duties relating to his employment with WEC/Toshiba in Japan. According to Wife, Husband could have continued to work until September of 2017 under the 2013 agreement, but he chose to negotiate a new agreement, attempting inter alia to retain the EPP and to also receive the benefits of the $7,000,000 amount used by WEC to purchase the life insurance policy that was placed in the trust. WEC refused to accede to this demand, which then resulted in the 2016 agreement whereby, without Wife's knowledge, Husband had abandoned the rights provided by the EPP. In response, Husband claims that he instead received the $7,000,000 fund

that was used to purchase the life insurance policy plus other additional benefits, not simply an exchange of the EPP for the Nationwide policy.

In dealing with the above facts, the Master set forth the following findings:

> 137.  The Master finds that the negotiations leading to the June 21, 2016 employment agreement and secondment[2] to Japan were a comprehensive agreement for all terms and rejects [Wife's] argument that [Husband's] release of the WEC EPP was a one for one exchange for the payment to the trust to enable acquisition of the Nationwide policy;
>
> 138.  The Master finds that [Husband] released the WEC EPP, a marital asset, as part of a comprehensive agreement covering many issues, including but not limited to a one[-]time payment to a trust to enable acquisition of the Nationwide policy;
>
> 139.  While the Master appreciates that [the] WEC EPP may be gone for all participants due to the WEC Bankruptcy, that fact was not known when [Husband] agreed to the release that resulted in [Husband's] entering a comprehensive agreement covering many issues, including but not limited to a one[-]time payment to a trust to enable acquisition of the Nationwide policy[.]

MR&R at Nos. 137, 138 and 139.

As for evidence in the record to support the Master's findings as to this issue, we note a statement in an email sent by Husband, which discussed three issues that were of concern to him during the contract negotiations in 2016 before he accepted the position with Toshiba in Japan.  Husband indicated that one of the areas to be resolved related to "the life insurance

---

[2] "Secondment" is defined as "the detachment of a person (such as a military officer) from his or her regular organization for temporary assignment elsewhere."  www.meriamwebster.com/dictionary/secondment.

policy to replace EPP." Husband's Email, 6/1/16 (see Exhibit 45). However, Husband testified that he was not trading the EPP for the trust supported by the insurance policy. Likewise, WEC's general counsel testified that WEC did not contemplate that the EPP was replaced by the Nationwide policy.

Meanwhile, Wife emphasizes the language of section 3501(a)(4), stating that if marital property is used to acquire different property after separation, the acquired property is to be considered marital. Moreover, Wife contends that there is no implication that the property exchanged must be of similar or equal value to the property acquired. Simply stated, Wife asserts that nothing more than an exchange is necessary and that, therefore, each party is entitled to their 50% of the newly acquired marital property. Lastly, Wife contends that a difference exists between the exchange of a marital asset and a dissipation of a marital asset. She suggests that "dissipation" means "wasting," while "exchange" means a "trade," and that what occurred here was a trade, not a wasting. Thus, Wife asserts that pursuant to section 3501(a)(4) the Nationwide policy should be considered a marital asset that should be divided between Husband and Wife.

We recognize that this Court's decision in Fishman v. Fishman, 805 A.2d 576 (Pa. Super. 2002), provides some guidance, although Wife argues it is not applicable while Husband asserts that the trial court's decision here correctly follows the Fishman decision. In Fishman, the husband had acquired a 19.6% interest in an accounting firm (ZA) for which he had worked

for nineteen years. At that time, he and several other partners purchased the health care consulting portion of the accounting firm, thus, creating a new, separate entity (ZAC). This occurred after the husband and the wife had separated. The trial court determined that the husband's interest in ZA was a marital asset, but that his interest in ZAC was not marital. On appeal, the wife argued that the husband's interest in ZAC was marital because it was acquired with marital funds, even though the acquisition occurred after separation. The wife relied on a claim that a portion of the purchase price for ZAC came from the husband's waiver of his right to a partnership buyout from ZA. In concluding that the wife had failed to present sufficient evidence that the husband's interest in ZAC was purchased with marital funds, this Court explained:

> Husband acquired his interest in ZAC in 1997, three years after the parties separated. The purchase price of $5.25 million dollars was funded solely through PNC Bank. Finding of Facts, 11/20/01, at 4. Husband did not use marital assets to purchase ZAC. Although the four partners withdrawing from the accounting firm were required to waive or surrender any contractual interests remaining in ZA, wife presents no evidence that these waivers contributed to the purchase price of ZAC. The formal stock surrenders of husband and his partners may have been necessary to maintain the viability of a closely-held corporation, and were unrelated to the purchase of ZAC. Wife has failed to establish that husband purchased ZAC through the waiver of his 19.6% interest in ZA. As a result, the trial court properly determined that ZAC was a non-marital asset.

Id. at 578.

Based upon our review of the parties' arguments and the decisions by the Master and the trial court, we are compelled to agree with Husband's

position, which tracks the Fishman position, i.e., that waiving a benefit in the context of a business transaction does not equate with an exchange of marital property for non-marital property. Moreover, Wife has failed to provide evidence to counter the Master's and the court's determinations that Husband's waiver of the EPP as part of the contract negotiations in 2016 was not an exchange of marital property. Rather, Husband's relinquishment of the EPP was just one part of the negotiated, comprehensive compensation plan into which Husband entered. Accordingly, we are compelled to conclude that the trial court did not abuse its discretion by determining that Husband's acquisition of the Nationwide policy in trust was not an exchange for the relinquishment of the EPP.

Wife's second issue concerns the security of the $11,493.00 monthly payments from the trust funded by the Nationwide policy, which are to be paid by Husband to Wife for a period of more than 25 years. In the March 22, 2018 order, the court set up this arrangement, having concluded that Husband had dissipated marital funds comprised of his waiver of the EPP, so that Wife would receive all 310 payments[3] even if Husband would die prior to Wife's receipt of the entire amount due. In her motion for reconsideration of the March 22nd order, Wife listed her concerns and requested additional security, which was granted by the court by order entered on May 14, 2018. That order provided

_____

[3] Wife began receiving these payments from Husband in August of 2017.

- 14 -

that if Husband died, the entire proceeds of the Nationwide policy would be payable to the trust, thus, ensuring that Wife would continue to receive the monthly payments due her. Moreover, Husband would own the policy and, while he could not transfer or encumber it, he could with Wife's agreement borrow against the policy with a requirement that 25% of any withdrawal be paid into the irrevocable trust. Essentially, as part of the May 14th order, the court explained its intent, stating:

> While intended to provide reasonable security, there is no intent to cause [Husband] to incur costs of a separate instrument and while reasonable security is the intent, without extreme costs and measures, little to nothing will be 100% secure, even though it will be reasonably secured, which is why there can be post[-]Decree enforcement if needed.

Trial Court Order, 5/14/18, at 1. However, the May 14th order was vacated by the August 21, 2018 order.

The August 21, 2018 order provided that a John Hancock life insurance policy, which replaced the Nationwide policy, should be maintained and should contain a death benefit that would be sufficient to cover the monthly payments due Wife. The order allowed Husband to substitute a different life insurance policy for the John Hancock policy and provide notice of same to Wife and her attorney. The court also directed inter alia that the beneficiary of the policy be the irrevocable trust, that the court retained continuing jurisdiction of the matter, that Wife or her attorney could no more than monthly contact the trustee of the trust to confirm compliance with various terms of the trust, and that Wife is to be notified about any changes to the funding of the trust and

to ensure that an insurance policy remains in effect. However, Wife claims that when the court vacated the May 14, 2018 order by way of its August 21, 2018 order, Husband was allowed unlimited access to the Nationwide policy. She claims Husband had unrestricted access to the policy's cash value, was not required to pay the proceeds of the policy into an irrevocable trust, and that any partial withdrawals against the cash value did not need to be placed in trust for Wife's benefit. See Wife's brief at 52-53.

As support for her contentions about her security concerns, Wife relies on Berhalter v. Berhalter, 173 A. 172 (Pa. 1934), and Goldstein v. Goldstein, 512 A.2d 644 (Pa. Super. 1986), two equitable distribution cases utilizing partition of entireties property in order to provide a remedy when misconduct occurs, equating to the dissipation of entireties property as in the present case. The Goldstein opinion states:

> [T]he Berhalter rule is not merely designed to afford the injured spouse a recovery of money actually taken. Implicit in the opinion is the conviction that the injured party should not be subjected to the risk of future misappropriation by a spouse who has disregarded the tenancy's fundamental obligation.

Goldstein, 512 A.2d at 650. Wife focuses on this principle to counter the trial court's intention that its order was providing "reasonable security." Wife requests this Court to "remand the case with instructions to utilize the Nationwide policy as security, to fully protect its cash value against removal or dissipation prior to Husband's death, and to pay off all unpaid installments

in a lump sum when Husband dies, rather than attenuate the payment stream for paternalistic or other undisclosed reasons." Wife's brief at 53-54.

In response, Husband asserts that the law does not set a standard for security; rather, he claims that such a determination is within a trial court's discretion. Husband also cites the Divorce Code, 23 Pa.C.S. § 3502(e), which lists the enforcement powers of the court.[4] Then, after listing some of Wife's

_____

[4] Specifically, section 3502(e) provides:

> (e) Powers of the court.—If, at any time, a party has failed to comply with an order of equitable distribution, as provided for in this chapter or with the terms of an agreement as entered into between the parties, after hearing, the court may, in addition to any other remedy available under this part, in order to effect compliance with its order:
>
> (1) enter judgment;
> (2) authorize the taking and seizure of the goods and chattels and collection of the rents and profits of the real and personal, tangible and intangible property of the party;
> (3) award interest on unpaid installments;
> (4) order and direct the transfer or sale of any property required in order to comply with the court's order;
> (5) require security to insure future payments in compliance with the court's order;
> (6) issue attachment proceedings, directed to the sheriff or other proper officer of the county, directing that the person named as having failed to comply with the court order be brought before the court, at such time as the court may direct. If the court finds, after hearing, that the person willfully failed to comply with the court order, it may deem the person in civil contempt of court and, in its discretion, make an appropriate order, including, but not limited to, commitment of the person to the county jail for a period not to exceed six months;
> (7) award counsel fees and costs;
> (8) attach wages; or

concerns relating to the manner in which she believes Husband could interfere with her receipt of the monthly payments during his lifetime, Husband points out that the policy is protected by the trust, is subject to the court's orders, and that Wife has access to information about the policy on an ongoing basis. Thus, Husband suggests that if Wife would identify any impropriety or risk or a failure to pay, the court has the power to employ the enforcement remedies, thus, protecting Wife's interests. We agree.

Again, after reviewing Wife's and Husband's arguments and the appropriate portions of the record, we conclude that the trial court did not abuse its discretion in the manner it concluded would provide security for the ongoing payments to Wife. In the event that it becomes necessary, Wife has the ability to request enforcement by the court.

We next turn to Wife's third issue, which relates to her entitlement to APL. Essentially, Wife claims that the trial court improperly granted deviations to Husband relating to his support of Wife after separation in August 2015 and before Wife filed for support in 2016, and for his receipt of a housing allowance and car and driver services while working in Japan.

Initially, we recognize that when reviewing an order concerning an award of APL, we must determine whether there was an error of law or an

---

(9) find the party in contempt.

23 Pa.C.S. § 3502(e).

abuse of discretion. See Haentjens v. Haentjens, 860 A.2d 1056, 1062 (Pa. Super. 2004). Moreover, APL awards must be supported by competent evidence found in the record. Id. See also Pa.R.C.P. 1910.16-5 (stating "[i]f the amount of support deviates from the amount of support determined by the guidelines, the trier of fact shall specify, in writing or on the record, the guideline amount of support, and the reasons for, and findings of fact justifying, the amount of the deviation").

The trial court's discussion of Wife's exceptions to the downward deviation of the APL award provides:

> The Master made several specific deviations to [Wife's] support/APL award, each specifically set forth in separate Findings of Fact. The discussion herein addresses only the deviations, as the deviations are the sole basis of [Wife's] exception[s]. The separate Findings of Fact addressing the deviations are set forth herein in detail:
>
> > 122. The Master is providing for a deviation in the amount of $95,953.07 against [Wife's] APL in the 2016 year to account for the fact that a large portion of the APL relates directly to a fiscal year bonus paid in 2016 for a period post separation wherein [Wife] was fully supported using [Husband's] post[-]separation earnings - to wit: $95,953.07;
> >
> > 123. The $2,449,557.95 of 2016 net income upon which [Wife's] APL will be computed includes, inter alia, the Tokyo housing allowance and car/driver and the relocation allowance;
> >
> > 124. The cost of living in Tokyo[,] Japan is higher than that in Butler County, Pennsylvania;
> >
> > 125. [Husband] was contractually bound to an apartment lease in Pittsburgh of $5,800.00 per month at the time

he was seconded to Tokyo, Japan[,] which he was required to pay though February, 2017;

127. While remaining in the U.S., [Wife] had the use of homes, cars, the horse and tangible personal property while being required to pay the mortgage and minimal costs for the Redmond Court, Cranberry Township, Butler County, Pennsylvania home and gasoline for the cars she used;

128. [Wife] was not required to pay upkeep/repairs on the property she used nor was she required to pay toward various insurances despite her request for a full APL award;

129. The housing allowance and car/driver in Tokyo, Japan did not provide [Husband] with disposable income as he was still paying on his apartment in Pennsylvania and he was not permitted to drive in Japan;

130. The car and driver in Japan were a necessity of [Husband's] secondment that did not put money into his pocket from which he could pay APL, particularly since he was still paying $5,800.00 per month on a lease in PA and that he was not permitted to drive in Japan;

131. The relocation allowance for moving [Husband's] personal belongings to Japan so that he could carry out his secondment that led to higher base wages and other cash allowance against which [Wife] claims APL, was a necessity to enable [Husband] to receive the compensation;

132. The Master is applying an APL deviation in the amount of $29,808.00 against [Wife's] APL for the period of July 1, 2016 through December 31, 2016 that relates directly to the Tokyo housing and car/driver and the relocation allowance;

[Wife] has not set forth any precise exceptions/objections to the separate findings of fact addressing the downward deviations. Regardless of any procedural concerns, review of the record before the Master, the findings of fact and conclusions of law and the support/APL award determined by the Master shows a

reasoned and well thought out computation ... by the Master with full and complete consideration of the support/APL and explanation for all of the deviations as is required by the rules.

With respect to the deviation for housing and the car and driver, [Wife] averred in her brief or argument, as the case may be, that the Master provided for a full deviation without taking into consideration the tax impact thereof. [Wife's] allegations misstate the facts. Specifically, the Master included $124,064 in [Husband's] gross income in 2016 for housing allowance ($86,161), [c]ar allowance ($33,313) and relocation ($4,600), yet only provided for a deviation in the amount of $29,808. The deviation represents only 24% of the gross income included by the Master in [Husband's] income. The Master did not err or abuse her discretion in providing for the downward deviations of support/APL.

Trial Court Opinion, 3/22/18, at 32-34 (unnumbered).

Wife has not convinced this Court that the deviations from the guideline amount were in error. The Master's findings and the trial court's acceptance of those findings, which our review reveals are supported by the record, comport with the directive provided in Rule 1910.16-5. No abuse of discretion occurred. Accordingly, we affirm the decision relating to the deviations to the APL award.

We now turn to the issues raised by Husband in his cross-appeals. With regard to his first issue, Husband claims that the record contains no support for the award to Wife of the 310 monthly payments of $11,493 due to Husband's waiver of the EPP, a marital asset. Rather, Husband asserts that Wife's payment should be reduced and should be limited to 60 months, the receipt of which was what Husband claims he had been guaranteed pursuant

to his 2013 employment agreement with WEC.[5]  Specifically, Husband quotes

the 2013 employment agreement, which states:

> The sum of Daniel Roderick's monthly benefit under the [EPP] and
> the Westinghouse Electric Company Pension Plan, each expressed
> as a single life annuity with a sixty month guarantee commencing
> immediately upon Daniel Roderick's termination of employment,
> shall not be less than $37,064.  If such sum is less than $37,064,
> the difference shall be paid as an additional annuity amount under
> the [EPP], subject to the terms and conditions of such plan for the
> payment of benefits....

Husband's brief at 18 (quoting WEC EPP Summary, RR 29b-54b).  Therefore,

Husband claims he was guaranteed a benefit of $37,064 per month for 60

months following the termination of his employment with WEC, but that after

the expiration of the 60 month period, he would not have been eligible for this

benefit because he had not met the age and/or years of service requirement.

Thus, Husband claims the record provided no support, nor was there a rational

basis for assuming that he was eligible for the receipt of payments after the

60 months.

Based upon this explanation, Husband asserts that the Master's findings

of fact Nos. 144 and 146, her discussion entitled "The WEC EPP and the

Nationwide Policy," and the trial court's adoption of these facts was an abuse

---

[5] Husband explains that WEC had both the EPP, which is not a tax-qualified plan, and a "tax-qualified, traditional defined benefit plan known as the Westinghouse Electric Company Pension Plan ("Pension Plan"), in which Husband also participated."  Husband's brief at 17.

of discretion because it concluded that the WEC EPP should last 310 months rather than 60 months.

Wife's argument in response relies on the fact that when Husband signed the 2016 contract, which followed the parties' separation, he relinquished his rights to the EPP, which was not an exchange for the benefits he acquired under the new contract.[6]  Then, based upon the language of the 2013 agreement, Wife asserts that Husband was guaranteed upon his retirement $37,064 per month for his lifetime regardless of his age or years of service; it was not limited to 60 payments.  Wife further explains that:

> [T]he most compelling evidence of the value of the EPP comes from the actions of Westinghouse in relation to the EPP. Westinghouse determined that the relinquishment of the EPP benefit combined with its payment into trust of $7,000,000 for [H]usband's benefit would trigger the application of I.R.C. §409A, which imposed an excise tax on the value of the benefit released. Westinghouse computed the value of Husband's EPP release at $7,000,000.   (See [Wife's]  brief at pp. 37-39, for a full development of this issue.)  The Master computed the gross value of the payments promised by the plan to be $12,008,736 - $12,045,800, and the adjusted present value to be $7,336,382 - $7,348,949. ...  Conversely, 60 payments of $37,064 equals only a gross value of $2,223,841, with a correspondingly lower present value, only 19.4% of the value attributed by Westinghouse to the EPP release.  The $7,000,000 sum chosen by Westinghouse clearly corresponds to Husband's life expectancy, not a payment guaranteed for only 60 months.

Wife's reply brief at 8-9 (footnote omitted).

_____

[6] Obviously, Wife acknowledges that her position in response to Husband's argument regarding his first issue is contrary to the position she takes in her appeal.

Our review of the arguments relating to the trial court's reasoning in its decision pertaining to the 310 payments rather than only the 60 payments does not convince us that the result here was an abuse of discretion. We accept the method that the trial court utilized to "effectuate economic justice between the parties." Palladino v. Palladino, 713 A.2d 676, 678 (Pa. Super. 1998). Therefore, Husband's first issue is without merit.

In his second issue, Husband claims that the Master and the trial court double counted the Pension Plan, see footnote 5, awarding Wife half of that benefit, i.e., a stipulated value of $155,304, to Wife's award when that benefit was already subsumed in the $11,493.80 monthly benefit under the EPP. Husband asserts that, "[b]y giving Wife both the defined benefit and the WEC EPP guaranteed amount, without any evidence to establish whether the monthly benefit under the WEC EPP exceeded the guarantee, the Master committed an abuse of discretion." Husband's brief at 22. Husband simply suggests that by awarding the $155,304 to him, this error is corrected.

In response, Wife quotes the following from the parties' stipulation:

In the event the [c]ourt would determine that it is appropriate to assume vesting of the benefit occurred or will occur, the marital value is $155,304 before consideration of income taxes as of February 28, 2017. Alternatively, if the [c]ourt would determine that the unvested benefit under the plan should be valued for Equitable Distribution purposes, the marital value is $25,223 before consideration of income taxes.

Wife's reply brief at 13 (quoting stipulation at R. 89b). Wife then points out that if the stipulation applied to Husband's argument, the $25,223 valuation

was the relevant amount in that the $155,304 applied only after the benefit was vested, which had not occurred at the time of trial. Moreover, Wife argues that if Husband had not dissipated the guaranteed lifetime annuity payment of $37,064 per month, that amount would have come from the EPP and not from the Pension Plan. She also claims that the $11,493 deferred equitable distribution payments, which is her share of the after-tax value of the EPP dissipated benefit, did not come from the Pension Plan. Accordingly, Wife asserts that no double counting occurred; rather, she was granted one-half of the marital portion of the EPP and one-half of the Pension Plan.

As Husband's requests, we have reviewed Exhibit A attached to the Master's report, which evinces the marital assets and the distribution of those assets. The exhibit shows that the Pension Plan was distributed 50/50 by a QDRO using a coverture fraction. Moreover, the exhibit also shows that the amounts attributed to the non-qualified plan, the EPP, was a separate asset. Thus, Husband has failed to identify anything in the record that would indicate that the Pension Plan benefit was already subsumed in the $11,493.80 monthly payment awarded to Wife relating to the EPP. Thus, Husband has failed to convince this Court that his second issue has merit.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/11/2019